Naomi Igra (SBN 269095)
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street Suite 2000
San Francisco, CA 94104
Phone: (415) 772-1200
Fax: (415) 772-7400

Raymond A. Atkins (*pro hac vice* pending)
ratkins@sidley.com
Tobias S. Loss-Eaton (*pro hac vice* pending)
tlosseaton@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington DC 20005
Phone: (202) 736-8000
Fax: (202) 736 8711

*Counsel for Union Pacific Railroad Company*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ALAMEDA COUNTY TRANSPORTATION COMMISSION and PAULINE RUSSO CUTTER, JOHN BAUTERS, ELSA ORTIZ, SCOTT HAGGERTY, RICHARD VALLE, WILMA CHAN, NATE MILEY, KEITH CARSON, REBECCA SALTZMAN, MARILYN EZZY ASHCRAFT, NICK PILCH, JESSE ARREGUIN, DAVID HAUBERT, LILY MEI, BARBARA HALLIDAY, JOHN MARCHAND, LUIS FREITAS, REBECCA KAPLAN, SHENG THAO, ROBERT MCBAIN, JERRY THORNE, and CAROL DUTRA-VERNACI, in their official capacities as Commissioners of the Alameda County Transportation Commission,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Union Pacific Railroad Company brings this complaint against the Alameda County Transportation Commission (ACTC or Commission) and the ACTC's Commissioners, in their official capacities:  Pauline Russo Cutter, John Bauters, Elsa Ortiz, Scott Haggerty, Richard Valle, Wilma Chan, Nate Miley, Keith Carson, Rebecca Saltzman, Marilyn Ezzy Ashcraft, Nick Pilch, Jesse Arreguin, David Haubert, Lily Mei, Barbara Halliday, John Marchand, Luis Freitas, Rebecca Kaplan, Sheng Thao, Robert McBain, Jerry Thorne, and Carol Dutra-Vernaci.

## INTRODUCTION

1. The ACTC has announced its intention to acquire, by eminent domain, part of Union Pacific's railyard and an associated transloading facility (a warehouse used to transfer cargo from trains to trucks or ships) in the Port of Oakland.  The Commission intends to condemn numerous permanent roadway easements and temporary construction easements through Union Pacific's property to reroute and expand 7th Street.  This plan would require demolishing a warehouse building on Union Pacific's property, rearranging the surrounding rail lines, permanently removing portions of track, and affecting the flow of rail traffic through the area.  ACTC's planned condemnation even purports to compel Union Pacific to perform track alterations at two Union Pacific facilities outside the Oakland Yard to facilitate ACTC's project.  The expected three-year construction process would impair railroad operations even more dramatically.  This planned acquisition is thus preempted by federal law and is unconstitutional.  Union Pacific therefore seeks declaratory and injunctive relief holding the condemnation unlawful.

2. The ICC Termination Act (ICCTA) gives the federal Surface Transportation Board exclusive jurisdiction over "rail transportation" and broadly preempts state laws that would regulate or burden rail operations. 49 U.S.C. § 10501(b).  Courts across the country have thus held that the ICCTA preempts condemnations that unreasonably interfere with railroad operations and interstate commerce.  Because the 7th Street relocation will significantly interfere with Union Pacific's rail transportation at the Oakland Yard—including by requiring the permanent removal of a building and adjacent tracks and rail yard used in transloading and switching operations—the ACTC's planned acquisition of easements by eminent domain is preempted and

1
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO.

unenforceable. And for much the same reasons, the acquisition would interfere with Union Pacific's interstate operations in violation of the Constitution's Commerce Clause.

3. The ACTC has scheduled a hearing on October 22, 2020 to adopt a Resolution of Necessity authorizing the acquisition of Union Pacific's property by eminent domain. This action gives ACTC the authority to immediately initiate condemnation proceedings. There is thus a live controversy between the parties over whether the Commission can legally acquire the subject property. Union Pacific therefore seeks a declaration that the ACTC's planned condemnation of Union Pacific's property is preempted and unenforceable, plus a permanent injunction prohibiting the Commission from following through on its plan.

**PARTIES**

4. Plaintiff Union Pacific is a Delaware corporation with its principal place of business in Omaha, Nebraska. It is a common carrier railroad engaged in interstate and intrastate commerce in many States, including California, as well as international commerce through the Port of Oakland. Union Pacific operates the largest railroad network in the United States, connecting 23 states in the western two-thirds of the Nation by rail. In 2020, Union Pacific operates an average of 4,260 locomotives over 32,340 miles of track. Union Pacific owns and operates a series of railyards in Oakland, including the Oakland Yard, which includes an intermodal facility and a manifest/classification yard near the Port of Oakland, the Desert Yard, and the East Oakland Yard.

5. Defendant ACTC is a county transportation agency created under the Local Transportation Authority and Improvement Act, Cal. Pub. Util. Code § 180000 *et seq.*, and a Joint Powers Agreement dated March 25, 2010. The ACTC may be served at 1111 Broadway, Suite 800, Oakland, California 94607. On September 15, 2020, the Commission issued a Notice of Intention to Adopt a Resolution of Necessity to acquire Union Pacific's private property for public use.

6. Defendants Pauline Russo Cutter, John Bauters, Elsa Ortiz, Scott Haggerty, Richard Valle, Wilma Chan, Nate Miley, Keith Carson, Rebecca Saltzman, Marilyn Ezzy Ashcraft,

1  Nick Pilch, Jesse Arreguin, David Haubert, Lily Mei, Barbara Halliday, John Marchand, Luis
2  Freitas, Rebecca Kaplan, Sheng Thao, Robert McBain, Jerry Thorne, and Carol Dutra-Vernaci
3  are members or commissioners of the ACTC.  They are named in their official capacities and
4  may be served at 1111 Broadway, Suite 800, Oakland, California 94607.  On information and
5  belief, the Commissioners intend to adopt a Resolution of Necessity condemning Union Pacific's
6  private property for public use at a hearing scheduled for October 22, 2020.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Union Pacific's claims under 28 U.S.C. §§ 1331, 1983, and 2201 and *Ex Parte Young*, 209 U.S. 123 (1908), because Union Pacific seeks prospective non-monetary relief against the enforcement of a local law that violates the Constitution and laws of the United States.  "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 (1983).  Further, "a private party may seek declaratory and injunctive relief against the enforcement of a state statutory scheme on the ground of federal preemption." *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1269 (9th Cir. 1994) (citation omitted); *see also Oregon Coast Scenic R.R., LLC v. Oregon Dep't of State Lands*, 841 F.3d 1069, 1072 (9th Cir. 2016) (A plaintiff "presents a federal question by alleging that enforcement of [a] state . . . law is preempted by the federal ICCTA" and the district court thus has "subject matter jurisdiction under 28 U.S.C. § 1331.").

8. The Court may declare the parties' legal rights and obligations under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, because this action presents an actual controversy within the Court's jurisdiction.

9. This Court has personal jurisdiction over the ACTC as a county transportation agency of Alameda County in the State of California.  This Court has personal jurisdiction over the Commissioners, in their official capacities, because they are residents of the State of California and officials of the ACTC.

10. Venue is proper under 28 U.S.C. § 1391(b)(1) because the ACTC is a subdivision of the State of California located in, and with its principal place of business in, the Northern District of California. Venue is proper under § 1391(b)(1) because the Commissioners maintain an office in the Northern District of California in their official capacities. Venue is also proper under § 1391(b)(2) because a substantial part of the activity concerning the condemnation of Union Pacific's property occurs in this judicial district, specifically in the City of Oakland and Alameda County.

## BACKGROUND AND FACTUAL ALLEGATIONS

### *State and Local Regulation of Railroads and the Commerce Clause*

11. Rail transportation is an inherently interstate activity. Thus, "the courts long have recognized a need to regulate railroad operations at the federal level." *City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998); *see Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001) ("The regulation of railroad operations has long been a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce."); S. REP. NO. 104-176, at 6 (1995) (emphasizing the need for a "nationally uniform system of economic regulation" of railroads). Indeed, railroads are subject to one of "the most pervasive and comprehensive of federal regulatory schemes." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981).

12. Even so, states have often tried to regulate certain aspects of railroad transportation. The Supreme Court has "frequently invalidated" such efforts. *Id.* For example, the Court struck down an Arizona law that imposed a maximum train length of fourteen passenger cars or seventy freight cars. This state regulation violated the Commerce Clause. *S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 769 (1945). In striking down the Arizona law, the Court observed that national uniformity in such regulation "is practically indispensable to the operation of an efficient and economic railway system." *Id.* at 772. The Court has since emphasized that the Commerce Clause is "a self-executing limitation on the power of the States to enact laws

imposing substantial burdens on such commerce." *South-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984); *see Pike v. Bruce Church, Inc*. 397 U.S. 137 (1970).

### *The ICC Termination Act*

13. Congress enacted the ICCTA in 1995 to abolish the Interstate Commerce Commission and empower its successor agency, the Surface Transportation Board (STB), to regulate rail transportation in the United States. 49 U.S.C. § 10501(a)(1). The ICCTA sought to implement a "[f]ederal scheme of minimal regulation for this intrinsically interstate form of transportation." H.R. REP. NO. 104-311, 96 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 808. "Congress intended to preempt a wide range of state and local regulation of rail activity." *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010).

14. Congress thus gave the STB exclusive jurisdiction over "transportation by rail carriers . . . with respect to rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers" and over "the construction, acquisition, operation, abandonment, or discontinuance of [tracks] or facilities." 49 U.S.C. § 10501(b). Apart from certain narrow exceptions, ICCTA's remedies are "exclusive and preempt the remedies provided under Federal or State law." *Id*. "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *City of Auburn*, 154 F.3d at 1030 (citation omitted). The ICCTA thus preempts state and local laws that (1) "have the effect of managing or governing rail transportation" or (2) as applied, have the effect of "unreasonably interfer[ing] with interstate commerce." *Oregon Coast*, 841 F.3d at 1077.

15. Intermodal or transloading facilities—which store or transfer containers or trailers of cargo between trains and tractor-trailer trucks or ships—"fall within the ICCTA's definition of 'transportation.'" *Vermont Ry., Inc. v. Town of Shelburne*, No. 2:16-CV-16, 2016 WL 3629081, at *8 (D. Vt. June 29, 2016) (collecting cases). The statute defines a "railroad" to include "intermodal equipment used by or in connection with a railroad . . . [and] a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for

transportation." 49 U.S.C. § 10102(6)(A), (C).  And the Supreme Court has long held rail transportation services include warehouses providing freight service, including transloading and storage. *See*, *e.g.*, *Merchants' Warehouse Co. v. United States*, 283 U.S. 501, 506 (1931).

### *Union Pacific's Oakland Yard Facility*

16. Union Pacific's Oakland Yard includes an intermodal rail ramp facility adjacent to the Port of Oakland and a manifest rail yard for classification.  Oakland Yard's intermodal ramp and manifest/classification yard use a series of six rail tracks that traverse the current 7th Street grade separation for access to Desert Yard, access to the main rail line, and for switching operations.

17. The average length of the tracks comprising the intermodal ramp is 4,500 feet, and the average length of the tracks comprising the manifest/classification yard is 3,600 feet.

18. Operations on the intermodal ramp facility include the transfer of cargo between trains, trucks, and ships, as well as the receipt of inbound trains and switching operations to build outbound trains of cargo bound for continued transport to another Union Pacific facility.

19. The manifest/classification yard is also used for similar operations, plus switching operations for local trains for delivery of cargo to final destinations in the Oakland area.

20. The Oakland Yard's operations support fourteen to fifteen trains on average, including a mix of intermodal, manifest, and local trains.

21. Trains inbound to the Oakland Yard range between 6,000 and 12,000 feet long, and outbound trains average between 10,000 and 13,000 feet long.

22. The Oakland Yard straddles the border between Union Pacific's main line Martinez subdivision, to the north, and the Niles subdivision, to the south.  The Martinez subdivision connects the Oakland Yard to Sacramento and on to northern California.  The Niles subdivision travels through Jack London Square to the East Oakland Yard and on to central and southern California.

23. Currently, operations for both the intermodal ramp and manifest/classification yard use the six tracks that traverse the 7th Street underpass for switching operations and to prevent trains from occupying portions of either the Martinez or Niles subdivision main lines.

24. A number of intercity passenger trains use both the Martinez and Niles subdivision main line tracks.

25. Union Pacific leases a building on this property to Pacific Coast Container, Inc. (also known as PCC or Pacific Transload Systems), which provides warehousing and trucking services for both refrigerated and dry cargo. The building is located at 2099 7th Street in Oakland.

26. PCC's primary business with Union Pacific consists of transloading frozen protein into intermodal containers for export to international markets.

27. PCC uses this facility for transloading, *i.e.*, for transferring a shipment from one mode of transportation to another.

28. The PCC building is served by two industry tracks that are part of the Oakland Yard, which connect to Union Pacific's main rail line that runs to Roseville, California.

29. These industry tracks have capacity to spot sixteen rail cars.

30. PCC receives approximately 300 rail cars annually from Union Pacific as part of its operations.

### *The ACTC's Proposed Project*

31. The subject 7th Street runs from downtown Oakland to the Port of Oakland. The street currently passes under Union Pacific's rail lines immediately next to the PCC transloading facility. That stretch of road consists of four 11-foot-wide lanes (two lanes in each direction) and a five-foot-wide multi-use path. The road underpass's vertical clearance is 14 feet.

32. The ACTC plans to reroute 7th Street, widen the four lanes to 12 feet each, add a four-foot inside shoulder and an eight-foot outside shoulder, widen the multi-use path to 14 feet wide, and increase the vertical clearance to 16.5 feet. The new route would still pass under Union Pacific's main rail lines, but now it would emerge on top of the PCC facility. Exhibit A

depicts the permanent and temporary easements ACTC seeks to condemn, overlaid on an image of Union Pacific's current facilities.

33. The Commission's plan thus requires demolishing the Union Pacific building used by PCC (although ACTC staff claim that part of the building could be saved).

34. The construction of the entire project would also involve significant, ongoing disruptions to Union Pacific's rail operations in the area.

35. ACTC informed Union Pacific that the construction of the project is estimated to take three years.

36. During construction, Union Pacific will be unable to use the six existing tracks that currently traverse the 7th Street underpass.

37. ACTC's plans call for the construction of two to three shoofly (temporary) tracks over 7th Street for limited rail operations during construction.

38. The Commission approached Union Pacific in early 2019 about acquiring the necessary property rights to complete the project.

39. The parties negotiated productively and in good faith for the better part of 14 months.

*Notice of Intention to Adopt Resolution of Necessity*

40. On September 15, 2020, the ACTC issued Union Pacific a "Notice of Intention to Adopt Resolution of Necessity" for the 7th Street relocation project. *See* Exhibit B.

41. On October 15, 2020, ACTC staff published a memorandum recommending that the Commission adopt the Resolution of Necessity and describing the 7th Street project. *See* Exhibit C.

42. The Notice identifies Union Pacific as the owner of real property, located at 7th Street, Oakland, California, that the Commission plans to condemn for public use under California Code of Civil Procedure § 1240.030's eminent domain powers. *See* Exhibit B at 3. Specifically, the ACTC intends to acquire six permanent roadway easements for the relocated 7th Street

8
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO.

and twelve temporary construction easements to complete the relocation.  *See id.* at 1; *see also* Exhibit A.

43. Purporting to rely on California Public Utility Code § 7557, the ACTC also plans to require "that Union Pacific [ ] perform certain cost to cure work prior to the commencement of Project construction," including a siding project and a track rehabilitation project outside the Oakland Yard and well outside the 7th Street project area.  Exhibit B at 3.

44. Section 7557 purports to authorize ACTC to "require the relocation or removal of [ ] tracks by exercise of the power of eminent domain."

45. ACTC asserts that the "cost to cure" work will accommodate the construction of the 7th Street project while minimizing impacts to Union Pacific's operations. See Exhibit C at 8.

46. According to the Notice, negotiations between the parties reached an impasse on July 29, 2020, prompting the ACTC and its Commissioners to pursue condemnation of Union Pacific's property.  Exhibit B at 1.

47. Union Pacific remains committed to productive discussions with the ACTC and its Commissioners to explore alternative means to accomplish their goals.  The Commission may continue to negotiate with Union Pacific over transfer of property rights necessary to complete the relocation of 7th Street, or it may seek a declaration from the STB that the rail facilities on the subject property are not necessary for rail transportation.  But it cannot force a transfer of these property rights in violation of federal law.

48. The proposed condemnation would substantially burden Union Pacific's ability to engage in rail transportation at its Oakland Yard.

49. The proposed condemnation would impact Union Pacific's operations in the wider region.

50. The ACTC's planned relocation of 7th Street will require demolishing at least part of a building used for transloading operations.

51. The ACTC's planned relocation will permanently reduce the capacity of the industry tracks next to Union Pacific's building that are currently used for transloading.

52. Condemnation would remove these resources from the rail transportation network permanently.

53. ACTC's project will prevent the use of at least one team track used for spotting and storing rail cars throughout the three-year construction period.

54. The ACTC's planned relocation will require removing track and portions of the rail yard used for spotting, switching, and storage of railcars.

55. The ACTC's reduction of tracks over 7th Street from the current six tracks to two or three temporary tracks will significantly impair Union Pacific's ability to conduct switching operations.

56. These switching operations are critical to maintaining the flow of inbound, outbound, and local trains.

57. This restriction of switching operations will likely result in trains occupying either the Martinez or Niles Subdivision main line tracks.

58. Trains occupying either the Martinez or Niles Subdivision main line tracks would impact both Union Pacific's operations throughout the region and the intercity passenger operations on those lines.

59. The project would also require the relocation of Union Pacific's rail-served customer, PCC.

60. Further, the project would permanently reduce, if not eliminate, rail service to the Union Pacific building leased to PCC.

61. The Oakland Yard's capacity for moving and transloading cargo will be reduced throughout the three-year construction period.

62. The impact of the ACTC's seizure of these assets will ripple beyond the immediate operations at the facility.

63. The loss of these industry tracks and portions of the rail yard will increase congestion throughout Union Pacific's rail network in the region.

64. The construction of the rerouted and widened 7th Street will also disrupt rail transportation on Union Pacific's lines that lead into and out of its Oakland facility.

65. This project will thus impede the movement of freight from and through this international multi-modal transportation hub.

66. The STB has described "using state eminent domain law to condemn railroad property or facilities for another use that would conflict with the rail use" as "the most extreme type of control . . . over rail transportation" covered by the ICCTA. *Norfolk S. Ry. Co. & the Alabama Great S. R.R. Co.—*Petition for Declaratory Order, FD 35196, 2010 WL 691256, slip op. at *3 (S.T.B. served Mar. 1, 2010) (ICCTA preempted the condemnation of presently unused railroad property to build a park because it would have prevented the railroad from expanding its operations in the future, conducting maintenance activities, and responding to derailments).

67. A taking is preempted by the ICCTA if it "would prevent or unduly interfere with railroad operations and interstate commerce." *City of Lincoln—*Petition for Declaratory Order, FD 34425, 2004 WL 1802302, slip op. at *2 (S.T.B. served Aug. 12, 2004), *aff'd City of Lincoln v. STB*, 414 F.3d 858 (8th Cir. 2005).

68. Courts regularly hold that the ICCTA preempts state or local condemnation actions that impede a railroad's use of its property for interstate commerce. *See*, *e.g.*, *Union Pac. R. Co. v. Chicago Transit Auth.*, 647 F.3d 675, 682 (7th Cir. 2011) (ICCTA preempted a condemnation action to acquire a portion of a main line corridor that would infringe on Union Pacific's use of the property for railroad operations); *City of Lincoln*, 414 F.3d at 858 (affirming the STB's conclusion that ICCTA preempted the condemnation of a 20-foot-wide portion of the railroad's right of way for pedestrian use); *Buffalo S. R.R. Inc. v. Vill. of Croton-on Hudson*, 434 F. Supp. 2d 241, 249 (S.D.N.Y. 2006) (finding "no question" that the use of eminent domain to acquire a rail transloading facility was preempted by the ICCTA); *Wisconsin Cent. Ltd. v. City*

*of Marshfield*, 160 F. Supp. 2d 1009, 1015 (W.D. Wis. 2000) (ICCTA preempted a city's condemnation action to remove a portion of the railroad's passing track to accommodate a highway overpass); *City of Siloam Springs, Ark. v. Kansas City S. Ry. Co.*, No. CIV. 12-5140, 2012 WL 3961346, at *3 (W.D. Ark. Sept. 10, 2012) (ICCTA preempted a condemnation action to obtain a trail easement that would result in structural modifications to a railroad bridge); *City of N. Little Rock, Arkansas v. Union Pac. R. Co.*, 808 F. Supp. 2d 1102, 1105 (E.D. Ark. 2011) (ICCTA preempted an eminent domain action to obtain a pedestrian and bicycle trail easement along track used for transloading, switching, and storage of railcars); *Soo Line R. Co. v. City of St. Paul*, 827 F. Supp. 2d 1017, 1022 (D. Minn. 2010) (ICCTA preempted the condemnation of a 24-foot wide strip of the railroad's right of way for a pedestrian and bicycle trail).  The ACTC's planned taking by eminent domain will impose an even greater burden on rail transportation than the condemnation actions in these cases because the exercise of its desired easements will require the removal of active rail lines and a building presently used for transloading operations.

69. ACTC's plans to require Union Pacific to complete "cost to cure" work associated with the relocation of 7th Street is further evidence of ICCTA preemption because it amounts to management of the railroad.  ICCTA preemption's core purpose is to prevent state regulation of railroads' economic decisions, and a "regulation which dictates the construction[,] design[,] and layout of railroad tracks would frustrate economic decision making." *Tex. Central Bus. Lines Corp. v. City of Midlothian*, 669 F.3d 525, 533 (5th Cir. 2012) (ICCTA prohibited a local government from "controlling how railroad track embankments are constructed"); *see* 49 U.S.C. § 10501(b) (the STB has exclusive jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of [tracks] or facilities").  And the STB has explained that state regulation of a railroad's design, construction, and maintenance of an active rail line would improperly "have the effect of managing or governing rail transportation." *Thomas Tubbs—Petition for Declaratory Order*, No. FD 35792, 2014 WL 5508153, at *4 (Oct. 29, 2014), *aff'd*, 812 F.3d 1141 (8th Cir. 2015).  State and local government attempts to regulate a railroad's construction operations fall within ICCTA's preemption heartland.

70. Further, the burdens on the free and efficient flow of interstate commerce stemming from the ACTC's acquisition of Union Pacific's property by eminent domain are "clearly excessive in relation to the putative local benefits," in violation of the Commerce Clause. *CSX Transp., Inc. v. City of Plymouth*, 283 F.3d 812, 818 (6th Cir. 2002) (citation omitted).

### *ACTC's Efforts to Condemn Union Pacific's Property*

71. A hearing is scheduled for October 22, 2020, at 2 p.m., at which time the ACTC's Commissioners will consider adopting "a Resolution of Necessity" authorizing the condemnation of Union Pacific's property. Exhibit B at 3. In the cover letter to the Notice of Intention, the Commission explains that it is pursuing the acquisition of Union Pacific's property by eminent domain because its negotiations with Union Pacific purportedly "reached an impasse." *Id.* at 1.

72. On information and belief, the ACTC's Commissioners intend to adopt the Resolution of Necessity and to thereafter initiate condemnation proceedings to acquire easements over Union Pacific's property in order to proceed with the 7th Street relocation project.

73. There is thus a real and substantial dispute over the legality and enforceability of the ACTC's proposed condemnation, which can be definitively resolved through a declaration by this Court determining the parties' legal relations.

74. This case seeks only prospective, non-monetary relief declaring the parties' rights and prohibiting the ACTC and its Commissioners from condemning portions of Union Pacific's property.

### **INJUNCTIVE RELIEF**

75. *Ex Parte Young* allows Union Pacific to seek prospective relief restraining Defendants from condemning portions of Union Pacific's property within the Oakland Yard facility.

76. Defendants' actions to condemn easements over portions of Union Pacific's property within the Oakland Yard facility are preempted by federal law and violate the Commerce Clause. They are thus void and unenforceable.

77. Union Pacific will suffer irreparable injury if Defendants are allowed to take and destroy its property.

78. The balance of the equities also favors an injunction. "[I]t is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law." *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (citation omitted); *see Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (when "Congress [has] expressly preempted [an] area of regulation," "there is no injury to the states to weigh against that which they threaten to inflict" on regulated parties).

79. Union Pacific is therefore entitled to permanent injunctive relief restraining Defendants from condemning easements over portions of Union Pacific's property within the Oakland Yard.

## COUNT I:

## THE CONDEMNATION IS PREEMPTED BY THE ICCTA

80. Union Pacific realleges and incorporates the paragraphs above.

81. ACTC's condemnation of Union Pacific's property impermissibly seeks to manage or govern rail transportation and would impose an unreasonable burden on railroad operations and interstate commerce. It is thus preempted by 49 U.S.C. § 10501(b).

82. ACTC's purported use of California Public Utility Code § 7557 to require Union Pacific to perform the directed "cost to cure" work impermissibly seeks to manage or govern rail transportation and would impose an unreasonable burden on railroad operations and interstate commerce. It is thus preempted by 49 U.S.C. § 10501(b).

83. The Court should enter a judgment under 28 U.S.C. § 2201 declaring that ACTC's acquisition of easements over Union Pacific's property by eminent domain and the attempt to compel performance of off-site "cost-to-cure" work, purportedly under California Public Utility Code § 7557, is preempted by the ICCTA.

## COUNT II:

## THE CONDEMNATION VIOLATES THE COMMERCE CLAUSE

84. Union Pacific realleges and incorporates the paragraphs above.

85. Union Pacific's operations at and through its Oakland Yard facility consist of mainly interstate activities, including the shipment of goods and raw materials from other states to California, from California to other states, and between California and international destinations through the Port of Oakland.

86. ACTC's condemnation of easements over Union Pacific's property will result in the permanent removal of tracks, portions of a rail yard, and a building from the interstate rail network.

87. ACTC's condemnation of temporary easements over Union Pacific's property will disrupt Union Pacific's operations within the Oakland Yard for the duration of the construction period.

88. The condemnation of temporary easements will also disrupt Union Pacific's operations throughout the region for the duration of the construction period.

89. Relocating and widening 7th Street will cause delays throughout Union Pacific's rail lines in the region.

90. Relocating and widening 7th Street will reduce the overall rail capacity of Union Pacific's Oakland facilities.

91. Condemning and acquiring easements in Union Pacific's property therefore imposes a substantial burden on the flow of interstate commerce.

92. The burden imposed by ACTC's condemnation of easements over Union Pacific's property on interstate commerce is excessive in relation to any local benefit it confers, and therefore violates the Commerce Clause.

93. The Court should enter a judgment under 28 U.S.C. § 2201 declaring that ACTC's acquisition of easements over Union Pacific's property by eminent domain violates the Commerce Clause.

**REQUEST FOR RELIEF**

Union Pacific respectfully requests the following relief:

a. On Count I, a judgment against all Defendants declaring that ACTC's acquisition of easements over Union Pacific's property by eminent domain is preempted by the ICC Termination Act, 49 U.S.C. § 10501(b), and is therefore void and unenforceable;

b. On Count I, a judgment against all Defendants declaring that ACTC's attempt to require Union Pacific to perform "cost to cure" work, purportedly under California Public Utility Code § 7557, is preempted by the ICC Termination Act, 49 U.S.C. § 10501(b), and is therefore void and unenforceable;

c. On Count II, a judgment against all Defendants declaring that the ACTC's condemnation of Union Pacific's property violates the Commerce Clause and is therefore void and unenforceable;

d. Permanent injunctive relief prospectively restraining Defendants and their employees or agents from acquiring the subject easements on Union Pacific's property by eminent domain;

e. An award of attorney's fees, as permitted by law;

f. Its other costs expended in this matter; and

g. Any other relief to which it may be entitled.

Date: October 22, 2020                    Respectfully submitted,

*/s/ Naomi Igra*

Naomi Igra (SBN 269095)
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street Suite 2000
San Francisco, CA 94104
Phone: (415) 772-1200
Fax: (415) 772-7400

Raymond A. Atkins (*pro hac vice* pending)
ratkins@sidley.com
Tobias S. Loss-Eaton (*pro hac vice* pending)
tlosseaton@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington DC 20005
Phone: (202) 736-8000
Fax: (202) 736 8711

*Counsel for Union Pacific Railroad Company*

---

17
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO.